DANIEL S. PEARSON, Judge,
dissenting.
In March 1980, the appellant, Bonnie Calder, sued the Uwanawiches, seeking damages under a claim of unjust enrichment and a related claim of fraud and misrepresentation.[1] The trial court granted the appellees’ motion for summary judgment on the ground that these claims were barred by the applicable statute of limitations, § 95.11(3)(j), Fla.Stat. (1979). I would reverse.
The facts underlying this controversy from which the trial court concluded that the actions were limitations barred are found in Calder’s deposition. The deposition reflects that in the latter part of 1972, Bonnie Calder was experiencing marital difficulties and sought the advice of Mary Uwanawich, a gypsy fortuneteller.[2] At their second meeting, Mary instructed Calder to purchase a tomato, wrap $200 around it, put it in a paper bag, place the bag underneath her bed, and to return with the tomato so that Mary could determine whether Calder was cursed. Calder followed these instructions and returned the next day. Mary stomped on the tomato, finding inside a black hairy mass and an object resembling an eye. From this, Mary concluded that Calder was indeed cursed and informed Calder that this curse was put upon her with money and therefore must be removed with money.
Either during or shortly after this meeting, Mary asked about Calder’s finances. She advised Calder that in order to rid herself of this curse, it was necessary for *913 Calder to wear upon her body $53,000 in cash and to spit into a jar three times, fill it with water, and place the jar in a paper bag underneath her bed. Calder followed Mary’s instructions and, still clad in money, returned to Mary’s apartment a few days later with the jar in the paper bag and a large pot. Mary rubbed the money and the paper bag containing the jar over Calder’s body. She removed the jar from the bag, discovered that it contained substances resembling blood clots and tumorous growths, and said, “Now we must burn this money to destroy this curse.” In Calder’s presence, the money, now wrapped in a bandanna, was placed in the pot and ostensibly burned.
Mary and Calder soon became friends. Calder loaned Mary $25,000 with which to purchase a home in Florida and gave her various sums for St. Ann’s Church. Mary moved to Florida, and she and Calder kept in contact by telephone.
During one telephone call, Calder told Mary that contrary to Mary’s instructions, Calder had inadvertently touched a pamphlet distributed by another gypsy reader. Mary told Calder that Calder was once again cursed and arranged to fly to New York to meet with Calder to repeat the jar and money-wearing/burning ritual. Thus it was that in September 1973, Calder, obviously having money to burn, once again brought Mary another $53,000, a jar, and a pot to the arranged meeting place, an airport hotel. Mary took the pot and dashed out of the room and into the hallway. Calder called for her to wait, noticing that Mary had a funny look on her face. Calder admitted that at this point, she became “a little bit suspicious.” Calder caught up with Mary, and both women walked to the rear of the hotel to an empty lot. Mary placed scraps of newspaper in the pot, and Calder asked to see the money in the pot. Mary told Calder that the money was there and that it would be bad luck if she “undid anything.” Calder then tried to “poke around” the pot, but Mary, holding a stick in her hand, pushed Calder away. The “burning” concluded, Mary admonished Calder for “trying to stir up trouble,” and the two parted company on friendly terms.
The question before us is whether the foregoing evidence conclusively demonstrates that Calder by September 1973 discovered or with the exercise of due diligence should have discovered the fraud which she alleges was perpetrated upon her, so as to make her action limitations barred as a matter of law.[3]
The statute of limitations for an action based on fraud is strictly construed against the party bringing the action and begins running when the alleged basis for the action was either discovered or should have been discovered by the exercise of due diligence. Matthews v. Matthews, 222 So.2d 282 (Fla. 2d DCA 1969).[4] However, while *914 “the law of fraud does not endorse a hear no evil, see no evil approach, neither does it require that an aggrieved party have proceeded from the outset as if he were dealing with thieves.” Hudak v. Economic Research Analysts, Inc., 499 F.2d 996, 1002 (5th Cir.1974), cert. denied, 419 U.S. 1122, 95 S.Ct. 805, 42 L.Ed.2d 821 (1975).
I regard the circumstances attending the money-burning rituals of 1972 and 1973 as presenting a jury question whether the fraud alleged should then have been discovered by Calder through the exercise of due diligence. In Pinkerton v. West, 353 So.2d 102 (Fla. 4th DCA 1977), cert. denied, 365 So.2d 715 (Fla.1978), the client, Pinkerton, retained West, an attorney, to enforce in this state a foreign order for alimony ar-rearages. West advised his client, and she agreed, to accept her former husband’s offered settlement as it was likely that he would respond by declaring bankruptcy. The client later sued the attorney, claiming that she was misadvised and that she discovered this misadvice only after consulting with another attorney. The attorney raised the affirmative defense that the suit was barred by the statute of limitations and successfully moved for summary judgment on that ground because more than two years before the suit was filed, the client, indisputably, had read an article informing her that bankruptcy does not discharge alimony and had written to the attorney questioning his competence and ethics. The appellate court reversed, noting that after Pinkerton read the newspaper article, she, as any layperson would have done, went to her attorney for confirmation and clarification and received assurances from the attorney that the law cited in the article was inapplicable in Florida. The court then held that it could not be said that as a matter of law Pinkerton was charged with knowledge that her lawyer erred or that she failed to use reasonable diligence to discover the mistake, and that it was a question of fact to be determined by the trier of fact “whether his incompetence was so glaring and of such magnitude that his client was on notice to pay no attention to any of his legal advice.” 353 So.2d at 103. Similarly, in Walker v. Dunne, 368 So.2d 640 (Fla. 2d DCA 1979), where a doctor informed a patient that a balloon tip was lost in her leg during surgery, but assured her that the subsequent amputation of that leg was unrelated, the appellate court overturned a summary judgment for the defendant doctor upon a holding that there was a factual issue as to whether the doctor “fraudulently concealed his negligence, and thus there was a factual issue as to whether his conduct tolled the statute of limitations.” 368 So.2d at 641. And in Swagel v. Goldman, 393 So.2d 65 (Fla. 3d DCA 1981), where the trial court granted summary judgment for the defendant based upon its conclusion that, as a matter of law, the limitations period began to run when after an operation the plaintiff learned he was incontinent, the appellate court reversed, reasoning that a genuine issue of material fact as to whether the plaintiff discovered or should have discovered the plaintiffs alleged malpractice was presented by the additional circumstances that the defendant-doctor continued to treat the plaintiff and assured him that the incontinence was a temporary and normal after-effect of the surgery. See also Almengor v. Dade County, 359 So.2d 892 (Fla. 3d DCA 1978) (plaintiff did not as a matter of law have sufficient notice of negligent act or injury where medical defendant or his agent acted to prevent inquiry, elude investigation, and mislead the plaintiff as to the existence of the cause of action); Eland v. Aylward, 373 So.2d 92 (Fla. 2d DCA 1979).
In the present case it cannot be said that as a matter of law Calder discovered or should have discovered the alleged fraud when, becoming “a little bit suspicious,” she asked to see if the money was really in *915 the pot, in light of Mary’s assurances that the money was there, and Mary’s threat of continued bad luck if the ritual were interrupted by Calder’s further actions. The most that can be said of this evidence is that it, as the evidence in Pinkerton, gave rise to a “suspicion of the trauma,” see Steiner v. Ciba-Geigy Corporation, 364 So.2d 47, 53 (Fla. 3d DCA 1978), that is, a suspicion that the money was being taken rather than burned. Therefore, since it cannot be said, as a matter of law, that before March 12, 1976, see n. 4, supra, Calder realized or, more aptly, should have realized, the alleged fraud, this issue must be left for the trier of fact to decide. See Burnside v. McCrary, 382 So.2d 75 (Fla. 3d DCA 1980); Nolen v. Sarasohn, 379 So.2d 161 (Fla. 3d DCA 1980); Rosen v. Sparber, 369 So.2d 960 (Fla. 3d DCA 1978); Schetter v. Jordan, 294 So.2d 130 (Fla. 4th DCA 1974). But see Matthews v. Matthews, 222 So.2d 282 (where the court held that where the record conclusively showed that the plaintiff discovered the fraud more than three years before instituting the suit, the suit was thus limitations barred as a matter of law, but in dictum stated that the question of whether the plaintiff should have discovered the fraud was one of law to be determined by the court).
The concept of reasonable diligence in discovering a cause of action inevitably “involves, to some extent at least, the state of mind of the person whose conduct is to be measured against this test and it is simply not feasible to resolve such an issue on motion for summary judgment.” Azalea Meats, Inc. v. Muscat, 386 F.2d 5, 10 (5th Cir.1967). It is obvious to me that the trial judge, and my fellow judges on the panel, have come to their own conclusions that Calder was guilty of colossal naivete in placing her trust in a gypsy fortuneteller. Perhaps, even probably, this conclusion would be reached by a vast majority of the people in our community. But merely because Calder’s faith may be exotic to the mainstream of society, she should not be held to some higher standard of diligence than is imposed on a plaintiff who is alleged to have been taken in by more common schemers. Although a judge may be of the view “that there were enough red flags” to have alerted the plaintiff that there was something amiss, this is a determination to be made by the trier of fact. Campbell v. Cowell, 342 So.2d 1037 (Fla. 4th DCA 1977). Calder says she believes in gypsy fortunetellers. A judge’s personal skepticism about that belief does not permit him to rule as a matter of law that Calder should have shared that skepticism. In my view, the sincerity of Calder’s belief and the reasonableness of her reliance on Uwanawich’s representations must be determined by a jury.

. These claims were contained in Counts II and III of Calder's second amended complaint. The original complaint, filed in June 1979, was a suit on a $25,000 promissory note, which became Count I of the second amended complaint. This count, totally unrelated to Counts II and III, is still pending in the trial court and is not involved in this appeal.

. Calder’s deposition is primarily devoted to the activities of Mary Uwanawich. Steven Uwana-wich, Mary’s husband, was alleged in the complaint to have conspired with Mary.

. Calder admits that in the fall of 1977, she read a book called King of The Gypsies that made her become uneasy about the Uwanawiches. Calder discussed with Mary the gypsy schemes which the book portrayed, and Mary responded that bad gypsies keep the money, and good gypsies burn it, and that she, Mary, was a good gypsy. Calder began to have her doubts. In January 1979, Calder visited another fortuneteller and told her of the 1972-1973 money-burning incidents. The fortuneteller told Calder that they never burned the money, and Calder realized she had been conned and went to the police. It is clear that only events occurring before March 12, 1976, that is, four years before the second amended complaint was filed, are relevant to the inquiry whether Calder discovered or should have discovered the alleged fraud. It is also irrelevant for present purposes that the four-year limitation period of Section 95.11(3)(j), Florida Statutes (1979), first became effective on January 1, 1975, and that as to actions arising beforehand, the predecessor three-year limitations period contained in Section 95.11(5)(d), Florida Statutes (1973), applies. See McGlynn v. Rosen, 387 So.2d 468 (Fla. 3d DCA 1980). If Calder discovered or should have discovered the alleged fraud by September 1973, her action is clearly time barred under the three-year statute of limitations; if she did not discover or should not have discovered it until at least 1977, her action is not time barred under the applicable four-year statute of limitations or even the inapplicable three-year statute of limitations.

. The statute of limitations in existence at the time of the 1972 and 1973 events, see § 95.-ll(5)(d), Fla.Stat., provided that a cause of action for fraud is not deemed to be accrued until "the discovery by the aggrieved party of the facts constituting the fraud.” This was con *914 strued to mean not simply actual discovery, but also "should have been discovered by the exercise of due diligence." See Matthews v. Matthews, 222 So.2d 282. In 1974, Section 95.031 (effective January I, 1975) was added so as to incorporate this construction as part of the statute of limitations.